Okay, thank you very much. We'll move to our third argument for the morning. Numbers 1834.16 and 1834.05, Quentin Crabtree v. Experian Information Solutions. Mr. Messer? Good morning, judges, counsel, may it please the court. My name is Joseph Messer. I represent Quentin Crabtree, who is the plaintiff in the case. We're here before the court based on 28 U.S.C. 1291 after the appealing entry of a final judgment. Plaintiff seeks that the final judgments of April 17, 2018 dismissing plaintiff's claim for lack of standing be overturned as well as the district court's October 15, 2018 order on the bill of costs and expert fees. This case is a case brought under the Fair Credit Reporting Act. Quentin Crabtree is a consumer under that act. He is a person whose consumer report was obtained by, and our position is, an impermissible purpose. This case is about pre-screening, and pre-screening is a case where the parties, typically lenders, obtain consumer reports in the way of a list based on criteria that are specified to the lenders in order to obtain those lists. In order for a pre-screening list to be provided to a lender, that lender must be ready, willing, and able to make the firm offer of credit that goes to the consumers that are listed on that list. Am I correct that Crabtree never requested to be removed from receiving pre-screened offers of credit? I don't think there's any record that he opted out of the position of receiving pre-screened offers. Okay, so if that is the case, what possible harm came to him that did not come to him many times a week? In other words, people who do not petition to be removed from pre-screened offers receive dozens, if not hundreds, of these every year. What was so humiliating about this one? Well, it doesn't have to be humiliating to create a right of action, and opting out is not a prerequisite to having the protections of the Fair Credit Reporting Act. The goal of the Act, one of the primary goals, is personal privacy, privacy of information, and whether or not a person opts out of pre-screening, they're entitled to not have their consumer information accessed based on an unauthorized or impermissible purpose. But what's your injury here, Mr. Messer? You're right, they're entitled not to have their information accessed under the pre-screening unless they opt out. There is a right for these certain lenders who are willing to give firm offers of credit to get the information. What is the harm that you are alleging here for standing purposes? It is the right of privacy that's specifically provided for under the Fair Credit Reporting Act. Okay, work that through for me, please. You're saying right of privacy. What's the injury based on the right of privacy? Standing does not require the same type, and this is the problem. Standing is not harm for purposes of damages, I understand that. For purposes of standing, you can't just say right to privacy. You've got to give more plausible allegations as to what is that right to privacy. I'm having a hard time understanding what your client's injury is based on privacy here. As a result of the Fair Credit Reporting Act, people are entitled to not have their information about their credit scores, whether they file for bankruptcy, whether they owe money or don't owe money. All that type of information is maintained by the credit reporting agency, CRAs. And consumers are entitled to have that information withheld from anybody unless they have a permissible purpose. And when a person that doesn't have a permissible purpose obtains that information, which is the case here, that person's information is given to that. But all indications are that a firm offer was extended, right? I mean, your client said, I think in his deposition testimony, that he likely, I don't think he had a clear memory of it, is my reading of it, but he said, I likely got it. I wouldn't have followed up on it. He didn't know whether he received it. In fact, there's no record that, one way or the other, as to whether it was sent or received. The company that purportedly, or the company that obtained the list, Data by Innovative Solutions, DBI, didn't know, they couldn't say one way or the other, whether it was sent. And importantly— But I don't think your colleagues on the other side of this are going to argue that, as a factual matter, it's as clear as day that no firm offer was ever sent out. I thought they were taking—there may well have been one on the mistaken view it came from TransUnion, or through the TransUnion sharing. But even if it did come from TransUnion, it wouldn't have come from an entity with a permissible purpose. Here we have a situation where this entity, Western Sierra Corporation, which supposedly was the lender-backer, the backer on this firm offer, was in bankruptcy, owed Equifax, the defendant, over $1 million. Equifax was fully aware of the fact that they were in bankruptcy. They were participating in the bankruptcy. They had terminated their right to obtain consumer reports from Equifax pursuant to a termination letter. And after that termination, when that termination period occurred, or during that period when they should not have been receiving consumer reports, they were receiving consumer reports. And is that your claimed injury, that Western Sierra received credit information about your client? Is that what you're claiming the right to privacy violation was? Are you claiming it's the failure to receive a firm offer of credit after getting that information? It has nothing to do with the failure to get the offer of credit or not exercising the offer of credit. It's the right to have your information kept from other companies. So it's the fact that some of his credit information was sent to Western Sierra? It was actually sent to DBI, which wasn't even an agent of Western Sierra. There's nothing in the record that says this company, DBI, was an agent of Western Sierra and apparently used for a mortgage offer, not a car loan, which is the only thing that Western Sierra was ever authorized to obtain consumer reports from the defendant for. They apparently went out on a mailer for a company called First Ohio. I'm just trying to pin you down, Mr. Mesmer, on what the injury is. The injury is actually having your information displayed or given to somebody that doesn't, that shouldn't have it. And that somebody here is DBI? It would have been DBI, and anybody at DBI that might have had access to it, who knows what happened to that list after the case? Is it Western Sierra as well? Western Sierra would not have real-time information. They would not get that information real-time because the system is set up in such a way that all that DBI has to do is sign on into a computer, and they can order these lists without Western Sierra even knowing at the time. So your privacy violation is based on the fact that DBI got credit information about your client? Correct. Through this prescreen process? Correct. That's the thrust of your privacy? And it was going to somebody that did not have a permissible purpose. And DBI didn't have a permissible purpose? They couldn't have because Western Sierra, they were supposedly working off the back of Western Sierra. It was supposedly the lender that was supposed to honor these prescreen offers if a prescreen offer had been made. How could that have occurred? There was never a legitimate offer. There never could have been a legitimate offer because this company was bankrupt and was actually terminated from the right to access this information in the first place. We have a right as consumers to avoid or to not have a situation where our information is made available to people that don't have the authority to have it. But one permissible purpose under the statute is sharing that leads to the extension of a firm offer, correct? If it's a legitimate firm offer. It could not have been a legitimate firm offer under these circumstances when Western Sierra had been terminated from its right to obtain prescreen lists. This is where it seems to get speculative in my mind because suppose, for example, I know it's counterfactual. But suppose, for example, that Mr. Crabtree took him up on it, got it, looked at it, said, yeah, I'll take him up on the offer of credit. Okay. At that point in time, when everybody checked it all out, they probably would have realized that that contract had been terminated. But would that have prevented Western Sierra, or for that matter, First Ohio, from saying, look, we've got to stand behind the offer of credit. We don't stand behind the offer of credit. We violated the FCRA. What you're doing when you go down that respectfully, when you go down that road, what you're doing is you're adopting this concept that the defendant has raised, which is that no harm, no foul because there's no injury until you try to take the person up on the offer. What we're saying is you have the right to have your information protected from disclosure in the first place when the recipient of the information does not have the permissible purpose. What seems odd to me about it, though, is that— —the circumstances of disclosure here. Is that an accurate depiction of the circumstances? And if it isn't, what is inaccurate? And I'm limiting my question to the first sentence of that page only. I'm sorry.  First sentence, top of page 18 of Experian's opening brief, the red brief. And Experian is describing there the circumstances of disclosure. And I'm asking if you agree that that's an accurate depiction. It says, notably, the circumstances of the disclosure here. The entities that were authorized to receive the information from Experian just two weeks prior, and who remained at the time authorized to receive the same information from other credit reporting agencies, negate plaintiff's claim that he suffered any concrete injury as a result of it? First of all, I don't know if they were authorized by other credit reporting agencies. So I can't respond to that. They could have gotten the records from Trackt. Excuse me? They couldn't have gotten it, for instance, from Transact? You mean TransUnion? That may well have been. But even if that's the case, the company, and we're talking about Western Sierra here, because that's the only entity in this scheme that can get this consumer report, because it's supposed to be the lender, it was no longer authorized to receive the information from Experian. And that's what that sentence says, authorized to receive information from Experian just two weeks prior. Well, we're two weeks after, so we're in a period when Western Sierra is not authorized to obtain the information and, importantly, is in bankruptcy, the contract has been terminated by Experian, and Experian is litigating with them over money owed by Western Sierra to Experian. How can such a company be making mortgage loans? It can be accessing consumer reports for purposes of making mortgage loans. Experian is supposed to have this goes back to the whole purpose of this FCRA, or the primary purpose that we're complaining about here. A CRA is required to have reasonable procedures in place to avoid the disclosure of consumer reports to those that don't have permissible purposes. In a situation like this, it is abhorrent to that concept that they are giving consumer reports to agents of Western Sierra when it's flat on its back, bankrupt, and doesn't have any money, and they're litigating with that company, and they terminated their right to those things. That's the privacy violation. We have a right to have our information kept from companies like that. If this – I'd like to reserve my time. That's fine. Yeah, you can reserve a minute, and we'll hear from your colleague now. Mr. Weers? Good morning, Your Honors. May it please the Court. Adam Weers on behalf of the appellee Experian. Much has been written in recent years about so-called no-injury lawyer-driven litigation. This case, I submit, presents the peak such example. The entire case was contrived by counsel working alongside his clients, who used to operate a lender called Western Sierra, in an effort to exact revenge against Experian related to some totally irrelevant side issue. Counsel was provided a half-decade-old prescreen list, saw a name he recognized, called the person, and convinced him to file a lawsuit. The so-called injury suffered by plaintiff relates to something he knew nothing about for six years, could not have cared any less about, and as his testimony demonstrates, still to this day is not sure what he is actually supposed to be upset about. This case does not present the Court with an actual case or controversy, and the District Court properly recognized that and dismissed the case for lack of Article III standing. This case relates to a nearly 8-year-old prescreen job initiated by an agent of a lender called Western Sierra. Back in 2011, Western Sierra's prescreen jobs were initiated pursuant to a contract it had with a company called Transact that provided it a platform from which it could access data from all three of the national credit bureaus. Here, one of Western Sierra's agents, Data by Innovative, initiated a prescreen job with Transact, which happened to have been sourced using Experian data. The agent testified that it sent out a firm offer of credit letter, as required by the FCRA, to everyone on the list. Plaintiff, whose name was on that prescreen list, says he can't recall if he received it, but if he did, like most of us, he would have simply ignored it. Now, at the time, Experian had terminated Western Sierra's contract due to a business dispute, but Western Sierra's separate contract with Transact was not terminated, and Western Sierra and its agents continued with business as usual, apparently under the understanding that Transact was using only TransUnion and Equifax data to generate prescreen lists. Plaintiff now alleges that the prescreen inquiry was impermissible because Western Sierra's contract with Experian had been terminated, and that he was somehow injured as a consequence. Notwithstanding, clear evidence that the offer would have been honored if plaintiff tried to accept it. So, the notwithstanding part of that's the rub of the case, right? So, Mr. Messer says if that initial sharing, if you will, Mr. Crabtree's name appearing on that prescreen list was not authorized, contract had been terminated, it's at that moment in time that his privacy rights are infringed upon, at least for purposes of Article III standing. And what you want to do, and I totally understand why, is you want to say, well, look where that led. That led nowhere. Because if he got a firm offer, he's already told us, he'd likely threw it away and wouldn't have done anything with it. And even if he had sought to, there's no reason at all to believe the offer wouldn't have been backed, right? So, at what point do we ask the standing question here? Mr. Messer is claiming that his injury is a privacy violation. And he's saying it's a privacy violation because there was a violation of a statute that was enacted to protect privacy. But if there was no violation, then there was no privacy harm. If he got the firm offer, if the offer was firm, there's no privacy harm. Because by definition, it was allowed under the statute. Point one. Point two is, and this is a second reason why there's not a privacy harm. Even if Western Sierra would not have honored it, it doesn't matter. Because the privacy harm here is simply Western Sierra having his name. But here, Data by IMS, Data by Innovative, it doesn't even know about this contract dispute. This is going on in the background. It's initiating this job regardless because Western Sierra never told it to stop initiating jobs. Indeed, Western Sierra's various agents, some of which were owned and operated by the owners of Western Sierra, were its business as usual. So it was going to be initiated through Transact under the master co-marketing agreement, regardless of whether experience data is available. If experience data had not been available, what would have happened? Well, the exact same list would have been generated. But how is that responsive to his arguments about injury? It's responsive to the arguments about injury because it's not a privacy violation if Western Sierra would have received that list anyway. And this goes to what the Seventh Circuit said in Groshek. In Groshek, there was a FCRA provision at issue that the Seventh Circuit found was enacted to protect privacy. And there was a violation of it. But Mr. Messer would have you say, that's the end of the story. You stop right there. That's a privacy harm. That's all you need to know. But that's not what the Seventh Circuit said. The Seventh Circuit said, you need to go a step further and say, was there actually a privacy harm? And in that case, they said no. And the reason is because notwithstanding the alleged violation there, there was some extraneous information provided on an authorization form. Notwithstanding that, the plaintiff was going to sign it and they would have gotten his information. The same is true here. You have to look to see whether there actually is a privacy harm. And here there's not, because Western Sierra was going to get Mr. Crabtree's name and address regardless. Is that something we can tell from the face of the complaint, though? Is that something that can be decided at this procedural posture in the case? Yes. We have a full evidentiary record in front of Your Honors. The case is, there's a full evidentiary record, and the standard is a preponderance of the evidence. And Your Honors can weigh the evidence. And here the evidence is Data by IMS was going to initiate this job. If the list happened to have been generated using TransUnion data or Equifax data, it doesn't impact plaintiff. His name is going to Data by IMS and Western Sierra in any event. There's no privacy harm there. The collateral attack on what's going on in the background didn't impact plaintiff's privacy at all. So another point would have been your point is that this is inevitable. And the inevitability was all part of perhaps for TransUnion or one of the others, Equifax or somebody. It's all part of ultimately an extension of a firm offer. So if we hypothetically, forget this case for a minute, and we have a sharing of information, unauthorized because a contract had been terminated or something, where it's not backed by any intent down the line to extend a firm offer, would that state an injury? So you have a really good fact in your hand here, right? And you're playing it well, but change that fact. In the scenario you raise where, so I don't think there would have been a privacy injury there. Well, it depends. Because Mr. Messer, I expect he'd respond to you and say, come on. If information is shared and it's not shared for any permissible purpose, there's no intent anywhere behind the sharing to result in a firm offer, that's a quintessential privacy violation. He might say that, and he might be right, but that's not the facts here. No, no, no. I know it's not. But the facts here are, and this is critical, I think, to analyzing your question. Dan Ridley, the owner of Western Sierra, testified under oath, if it came from TransUnion, we would have honored it. That's what he said. So the hypothetical you're raising, maybe there's injury there if it wasn't good. But here, it would have been honored. He said, and he has to say that, Your Honor, because remember this, he owns another agency, like Data by IMS, called Direct Performance Data. They're doing the exact same thing in the exact same time. They're also pulling pre-screened lists backed by Western Sierra. He owns this company. They're run by the same people. Otherwise, he's violating the law willfully every time. That's the point, right? So if, for example, I know it's counterfactual. But if, for example, Mr. Crabtree had accepted the firm offer of credit, called the number, sent the postcard in, whatever you do, right, Western Sierra or First Ohio for that, they couldn't have said, you know what, this was sort of sent in error, and there had been a contract that had been terminated or expired. Had they done that, that would actually violate the statute, right? It would, and then his injury would be that he didn't get the benefit of the bargain. He didn't get the firm offer. Well, I don't think he'd say his privacy was violated. My privacy is violated, and it led to no benefit. Well, I think it would depend on what the company, what happened at the time they received the data. If the company knew that it was, that that's what… They just looked at it and said, we're not honoring this. It's a mistake. Yeah, I don't think that that's a privacy violation. Assuming that the pre-screen inquiry was made legitimately, and the company at the time legitimately made it, and had a right to access the data. If at the back end they don't honor it, he has standing, because he's been denied that benefit, which is the… Congress bargained away his privacy rights when they passed this. The benefit he's getting is the firm offer. Are you saying there can never be a privacy violation for a violation of this particular provision of the statute? No, I think there can be. And in fact, the initial… I think there could be. If, for example, Experian was knowingly giving lists to a company it knew was going to misuse that data. Well, you have a company that was in the process of bankruptcy. And so it couldn't possibly be extending firm offers of credit at that point, right? Well, it actually could, and there are a couple of ways. One is, and this is very common in the pre-screening context, a lot of times the lender who makes the offer isn't the one that actually fulfills the loan. They will arrange credit. So that's something that easily could have happened here. And secondly, Experian doesn't know and can't be behind the machinations of the bankruptcy. It's assuming that companies are acting honorably. And indeed, Mr. Ridley testified. We have no reason to be testified under oath. Yes, we would have honored those. Those are firm offers. We just thought it was coming from TransUnion. Another point that Your Honor has touched on in the questioning of Mr. Messer that I think is important is this notion that plaintiff's theory is based exclusively on conjecture. If you start from the premise, which is correct, that if the offer is firm, then there's no privacy violation because there's been no statutory violation. And Spokio says, you know, conjecture isn't going to cut it. Well, this is all conjecture. What would have happened if he, a different person, received this and actually called it in? What would have happened if he did call it in and Western Sierra received the call? Well, what we know from the record is, and indeed it's even in plaintiff's briefing, they didn't have visibility to which bureaus sending the data. Who's they? Western Sierra. So if someone called this loan in, they would have, Mr. Crabtree called this in. Hi, I would love to accept this great offer I received in the mail. Western Sierra would simply accept it because they assume it's based on trans-union data, and even if for some reason in the back of their head they were thinking, oh, man, there's a chance this is Experian data, in which case for some reason we don't want to do it, they don't have visibility. They can't backfill that. Plaintiffs never address that or come to terms with it. Instead, the only argument plaintiffs make, so far as I can tell, is they simply say, violation of statute that was enacted to protect privacy, end of story. That's all we need to show. And that's not what the Seventh Circuit said in Groshek, it's not what they said in Gubala, and that's not what most of the circuits are saying in the recent case law. Mr. Weares, in the remaining time, I want to switch gears a bit and ask you about the cross appeal on the dismissal of a claim that you brought. Do you agree with me that the zone of interest test applies to the assessment of your standing under 1681NB? I don't know, Your Honor. Well, you brought a claim under that provision of the FCRA, and as I understand proper standing analysis, you need to ask the question, is the plaintiff within the zone of interest of the statute under which they brought a claim? And when I read 1681NB, it's very hard for me to envision Congress contemplating someone like Equifax invoking that provision to sue. It just seems to me to be a provision that's all about consumers and harm to consumers. Your Honor. I mean, am I reading it wrong? I believe you are, Your Honor, and I have it in front of me. Yeah, go ahead. Any person who obtains a consumer report from a consumer reporting agency under false pretense or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency. So this statutory provision is directly, I think under this provision, CRA is the only entity in the zone of interest potentially because here the liability is to the consumer reporting agency under 15 U.S.C. 1681N. Shall be liable to the consumer reporting agency. You don't read that as more about protecting consumers? It might also be about consumers, but I read it as certainly giving the consumer reporting agency as being in, as Your Honor puts it, the zone of interest, which I now understand your question, but yes, because I think this statute is specifically puts Experian in the zone of interest. If Your Honors have no further questions, I will. No, thank you very much. Thank you. Counsel made a comment about Mr. Ridley and his testimony. Importantly, the most important testimony that Mr. Ridley gave was that Western Sierra would not and did not have the capability of honoring firm offers of credit if they had been made and was not importantly, they were not even aware of this firm offer of credit. So the concept that maybe Western Sierra would have honored a firm offer of credit if it had come through TransUnion or some other source, it's totally irrelevant to this case. Maybe that would not have been legitimate for them to do that. Again, they're in bankruptcy. Counsel talked about, well, bankruptcy, you know, that might not have been, they might have been able to do something because there might be a ranging of credit, use that term. There's nothing in the record about Western Sierra arranging credit or doing anything with respect to these firm offers. What's clear in the record is that they were in bankruptcy, they owed over a million dollars to Experian and had been terminated by Experian from the right to obtain consumer reports. Counsel mentioned Groschak. Groschak is a completely different case because in that situation, the harm that was sought to be protected was not the type that we have in this situation, which was not a privacy act or privacy violation. In fact, there was nothing in the record as to how the consumer might have been confused about this extraneous information. Counsel also mentioned Spokio, which is precisely what shows why we should be protected here. The two tests, whether an alleged intangible harm has a close relationship to a harm that's traditionally been regarded as providing the basis for a lawsuit in English or American courts. Here, privacy, of course. Secondly, Congress's judgment as to the injuries, it sought to elevate to the status of legally cognizable injuries. Here, the FCRA and privacy rights. Those two things meet up and say that we've got standing. So for those reasons, we ask that you overturn the court's decision. Okay, thanks. Thanks to both counsel. The case is submitted.